In re Phyllis Jolene HODGES, Debtor.

Richard PISONI, Special Administrator
for the Estate of Velma
Rushing, Plaintiff,

v.

Phyllis Jolene HODGES, Defendant.

Bankruptcy No. 89–40166.
Adversary 89–0096.

United States Bankruptcy Court,
S.D. Illinois.

May 30, 1990.

Terrell Lee Sharp, William K. Richardson, Law Office of Terry Sharp, P.C., Mount Vernon, Ill., for debtor/defendant.

G. Patrick Murphy, Marion, Ill., for plaintiff.

## DECISION

DALE E. IHLENFELDT, Bankruptcy Judge.

The debtor, Phyllis Jolene Hodges, who served as executor of the estate of her aunt, Velma Rushing, has been charged in the complaint with "fraud or defalcation while acting in a fiduciary capacity" by the plaintiff, Richard Pisoni, Special Administrator of the Estate of Velma Rushing. Plaintiff asks that any debt owed by the debtor to the Estate of Velma Rushing be declared nondischargeable pursuant to § 523(a)(4) of the Bankruptcy Code. The bare allegation of fraud, lifted from the language of the statute, has not been pressed. Cross-motions for summary judgment on the defalcation issue have been

filed. The following facts are not in dispute.

Velma Rushing and her husband, William H. Rushing, executed a joint and mutual last will and testament on 12/2/80, wherein the debtor was named as executrix. Following William's death on 9/29/81, the will was filed for record only and not for probate, and an inheritance tax return was filed.

In approximately June of 1982, some nine months after William died, Velma Rushing was diagnosed with pancreatic cancer. Thereafter and prior to her own death on June 26, 1983,[1] Velma dealt with or disposed of various items of personal property as follows:

1. In November, 1982, she named the debtor as joint tenant on a $10,000 certificate of deposit at Carterville State & Savings Bank and delivered it to the debtor. The debtor cashed in the certificate about June 30 or July 1, 1983.

2. In January, 1983, she named the debtor as joint tenant on a savings account at Carterville State & Savings Bank, which account contained $4,391.56 on the date of Velma's death.

3. In May, 1983, she named the debtor as joint tenant on a $16,000 certificate of deposit at Bank of Herrin and delivered it to the debtor.

4. In June, 1983, she named the debtor as joint tenant on her checking account at Carterville State & Savings Bank, which account contained $1,449.05 on the date of Velma's death.

5. In early June, 1983, she named the debtor as joint tenant on a 1981 Ford car.

6. In June, 1983, she delivered to debtor a wristwatch worth less than $59 which pursuant to her direction, was given to the debtor's daughter.

7. While she was hospitalized about two weeks prior to her death, she gave the debtor three diamond rings.

1. The probate court order, apparently incorrectly, gives the date of Velma's death as June 24, 1983.

8. At some earlier time, probably in 1981 or 1982, Velma had named the debtor as beneficiary of a $500 life insurance policy with Fort Dearborn Life Insurance Company. The proceeds of that policy were paid to the debtor on 7/10/83.

9. In February, 1982, Velma had placed an annuity from Charter Security Life Insurance Company in the debtor's name. The annuity proceeds of $17,643.13 were paid to the debtor in a lump sum in August, 1983.

The debtor knew that she had been named executrix in the joint and mutual last will and testament, and on July 4 and 5, 1983, she consulted with the attorney who had drafted the will, Carl D. Sneed. Sneed advised her that the above property belonged to her and was not a part of the Rushing estate. Thereafter she dealt with it as her own. On July 14, 1983, she was appointed executor of the Velma Rushing estate. Sneed represented her in that capacity. As such executor, the debtor administered the assets referred to in the will and filed a report showing a balance of $31,826.46 in the Estate's account.

In early July, 1983, a niece and nephew of Velma Rushing consulted an attorney who wrote to Sneed on their behalf on July 5, 1983. His letter states:

> If I read the Will that you prepared for Mr. and Mrs. Rushing correctly, all of the property that is in Mrs. Rushing's estate would go by intestacy with the exception of the house in Herrin, which goes directly to Mary Ellen Hunt. Would you please verify if this is correct.
>
> Also, there appears to be some question about some property that allegedly was given by Mrs. Rushing to Phyllis Hodges prior to Mrs. Rushing's death. Would you please advise me as to the status of this. Would you also please advise me as to what property, real and personal, is in the estate.

Sneed apparently agreed with that analysis, and he remained steadfast in his position and in his advice to the debtor that the only assets to be administered under the will consisted of real estate. Nevertheless, five and one-half years later, on December 9, 1988, following a Petition to Issue Citation to Discover Assets filed by the plaintiff on April 7, 1988, the state probate court found that Velma Rushing had violated the contractual obligations under the joint will and ordered the debtor to deliver the above itemized property to the estate. The debtor filed her bankruptcy petition on 2/17/89 seeking to discharge any liability to the Velma Rushing estate, and on 3/27/89, she filed a supplemental report with the probate court stating that the funds had been spent and disposed of between two and four years following the death of Velma Rushing. This adversary proceeding followed.

By its terms, the Rushings' joint will provided in paragraph 3 for disposition of certain real estate or its proceeds in the event William survived Velma, an event which did not occur. Paragraph 4 dealt with disposition of other real estate or its proceeds in the event Velma survived, an event which did occur. Paragraph 5 provided for disposition of *all* property in the event of simultaneous deaths, also a nonoccurrence. In paragraph 6 the Rushings named the debtor as executrix, and in paragraph 7 they described her authority. Inasmuch as the will contained no residual clause nor any other provision specifically disposing of personal property, the letter writer's comment that such property "would go by intestacy" would appear to be correct.

In its order, the probate court ruled that the joint will was in the nature of a contract, and that Velma Rushing's "attempts ... to dispose of her property by attempting to make gifts to Phyllis Hodges" and "to create joint tenancies with Phyllis Hodges" constituted a violation of the contractual obligations imposed upon her by the joint will. The court apparently relied upon paragraph 2 of the will in reaching its decision, in any event the only part of the will that the court referred to in its order. Paragraph 2 of the will provided:

> In consideration of our love and affection for each other and of a mutual understanding between us that all property belonging to us jointly or to either

of us individually is to pass as is hereinafter provided, and upon the death of the survivor of us all such property is to pass pursuant to the provisions hereof, we make this our Last Will and Testament. Each of us, in consideration of the premises and a like promise and agreement of the other which is hereby made, agrees not to revoke, change, alter or amend this will, except that prior to the death of us this will may be changed, cancelled, annulled or amended by another will or by a codicil, duly executed by both of us.

As may be seen, this paragraph provides that "all property belonging to us ... is to pass as is hereinafter provided, and upon the death of the survivor of us all such property is to pass pursuant to the provisions hereof," i.e., as provided in the will, or pursuant to the provisions of the joint will. There are no such provisions in the will, however, apart from Paragraph 5, with respect to the disposition of personal property. As the court gave no explanation for its ruling, it is difficult to understand the court's rationale for ordering the debtor to turn over to the estate the property that Velma had given her prior to Velma's death.

The nature of the obligation that the court imposed upon the debtor in its order is also unclear. In paragraph 12, the court found that "Phyllis Hodges, *individually* [emphasis added], should return [sic]" the personal property to the estate, and in its dispositive order, the court ordered "Phyllis Hodges ... to deliver [the property] to the Executor of the Estate of Velma Rushing, Deceased...." In the final paragraph of its dispositive order, on the other hand, the court provided, "Phyllis Hodges, Executor of the Estate of Velma Rushing, Deceased, is hereby ordered to amend her Report on Final Settlement to include the above-described items of personal property and the items of receipt."

In considering the question of whether a debt is excepted from discharge under § 523(a)(4), the court must determine whether a fiduciary relationship exists, and then whether fraud or defalcation has oc-

curred in the course of that fiduciary capacity. *In re Janikowski,* 60 B.R. 784, 788 (Bankr.N.D.IL.1986). The question of whether a debtor is a fiduciary under § 523(a)(4) is a question of federal law, not state law, although state law is relevant to that inquiry. *In re Short,* 818 F.2d 693, 695 (9th Cir.1987); *In re Black,* 787 F.2d 503, 506 (10th Cir.1986); *In re Johnson,* 691 F.2d 249, 251 (6th Cir.1982).

The term, "fiduciary" as used in § 523(a)(4) applies only to express or technical trusts and not to implied trusts which are imposed on transactions by operation of law as a matter of equity. Defalcation ordinarily implies some moral dereliction, but under § 523(a)(4), it may include innocent defaults, so as to include fiduciaries who for any reason are short in their accounts. *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2d Cir.1937); 3 *Collier on Bankruptcy,* ¶ 523.14, p. 523–95 (15th ed.).

To show nondischargeability under § 523(a)(4), a plaintiff must prove that:

1. an express trust existed,
2. the debt was caused by fraud or defalcation, and
3. the debtor acted as a fiduciary to the creditor at the time the debt was created.

The "usual elements of an express trust have traditionally included an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust relationship." *In re Harasymiw v. Selfreliance Federal Credit Union,* 97 B.R. 924, 926 (N.D.IL.1989); *In re Janikowski,* 60 B.R. 784, 789 (Bankr.N.D.IL.1986); *In re Thornton,* 544 F.2d 1005, 1007 (9th Cir.1976); *In re Kelley,* 84 B.R. 225, 229 (Bankr.M.D.FL. 1988). Each of these elements must be proved by clear and convincing evidence. *In re Harasymiw,* supra, p. 924.

The debtor must have occupied the position of a fiduciary prior to the debtor's acts that created the obligation. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). "In order to bring the debt within this exception, the fiduciary relationship must have existed

**156**

previous to or independent of the particular transaction from which the debt arises; and the debt should be due from the fiduciary in his capacity as fiduciary." 3 *Collier on Bankruptcy* supra p. 523–101. The trust must exist prior to the act of wrongdoing out of which the debt arose. *In re Pedrazzini*, 644 F.2d 756, 758 (9th Cir. 1981).

As noted earlier, it is unclear whether the liability imposed upon the debtor by the state court under state law was that of a fiduciary or that of an ordinary creditor. Whether or not, on the facts presented, the debtor should have been charged with liability of any kind, the order of the state court constitutes res judicata in that respect. *Kelleran v. Andrijevic*, 825 F.2d 692 (2d Cir.1987); *In re Sun Valley Foods Co.*, 801 F.2d 186, 189 (6th Cir.1986); *In re Comer*, 723 F.2d 737 (9th Cir.1984). This court must accordingly determine, in the light of the foregoing authorities, whether that liability represents a defalcation by the debtor as a fiduciary under federal bankruptcy law, more specifically § 523(a)(4) of the Code.

Velma Rushing's actions, as noted by debtor's counsel, are a classic example of what happens when one is diagnosed with a fatal disease. She had been diagnosed with cancer and knew she was going to die, and she began winding up her affairs and providing for the natural object of her bounty. From November, 1982 until the date of her death in June, 1983, Velma Rushing gave the debtor money in various forms or left it to her in joint tenancy. In early June, 1983, Velma Rushing moved into the debtor's home. The record does not disclose the location of Velma's death.

The personal property here in question came into the debtor's hands by way of gifts from Velma Rushing, whether outright or as a surviving joint tenant or a named beneficiary. There has been no suggestion, by the state court or anyone else, of fraud or undue influence on the part of the debtor with respect to such gifts. It can be fairly assumed that she acted in good faith in taking control of this property. She was careful to seek the advice of counsel and was told this was her property, which in the judgment of this court and on the record presented here was good advice.

If there was fault, it was that of Velma Rushing. The probate court said that Velma did not have a right to give the property to the debtor—that by doing so, she had breached the contractual obligations imposed upon her by the joint will. Accordingly, whatever obligation Phyllis Hodges had arose at the time that Velma Rushing gave her the property. There was no trust at that time, there was no intent to create a trust relationship, and the property was not given in trust. Phyllis Hodges was not a fiduciary at or prior to the time the debt was created. Her obligation could only have been that of an ordinary creditor. Had she thereafter declined to act as executor (or perhaps if the probate court had defined the obligation it was imposing upon her with greater clarity) it is unlikely that this action would have been brought. Her subsequent consent to act as executor did not convert her indebtedness into a fiduciary defalcation, at least not within the meaning and intent of § 523(a)(4) of the Bankruptcy Code.

In accordance with this decision, an order will be entered dismissing this action.